Jones, Chief Judge,
delivered the opinion of the court:
Plaintiff sues to recover amounts deducted which it alleges represent charges due on transportation services performed for defendant in early 1944. In defense of these deductions, the Government now asserts that the freight charges as determined were excessive.
The underlying issue of the case is whether the transportation privilege extended to rail shipments of ammunition and explosives routed through defendant’s Bialto Ammunition Back-up Storage Point, located near Bialto, California, constituted a “storage-in-transit”. If it is affirmatively so held, then the freight charges are to be computed on the basis of *341 the Association of American Railroads’ Section 22 Quotation 40-B. On tbe other hand, if it is determined that the service merely amounted to a “holding for orders”, which is the theory advanced by defendant, then the charges are to be arrived at under the authority of the Association of American Railroads’ Section 22 Quotation 31-C and the Atchison, Topeka, and Santa Fe Railway Company’s Circular No. 2140. Should it be decided that AAR 31-C had no application to the shipments in question, defendant takes an alternative position that Circular 2140 is applicable to all of the shipments.
The issue before us is substantially the same in fact and law as that which we considered in Chesapeake and Ohio Railway Company v. United States, decided this date ante, p. 204. For that reason, and in view of our decision, the opinion is necessarily brief. Only those facts relevant to a determination of the basic legal issue will be set forth. The facts in detail may be found in the findings of fact.
Defendant’s case is based essentially on its contention that the shipments here considered, following arrival at the Rialto depot, were “held for orders” within the contemplation of Circular 2140 (finding 20). The answer we supplied to defendant’s argument in the Chesapeake & Ohio case is here appropriate. Upon delivery to the Rialto depot’s enclosure, custody and possession of the cars passed from the carrier to the defendant (finding 8). Basically, Circular 2140 and Chesapeake & Ohio’s Freight Tariff No. 2418-H, considered in Chesapeake & Ohio, are the same. A comparison of the two will reveal identical language in most instances. As we ruled in Chesapeake & Ohio, we repeat here: the tariff contemplated possession by the carrier. This is true whether the service sought is diversion or reconsignment, or merely holding for written orders. Thus, the service ' performed at Rialto met the requirements of a “storage-in-transit” as plaintiff contends. That privilege was made available at the request of defendant under the terms and conditions of AAR 40-B (finding 15). Charges are properly to be assessed under that quotation.
Since defendant’s argument for the application of AAR 31-C is premised on the theory that the service performed at *342 Eialto depot was not a “storage-in-transit”, we have no need to mention that quotation further.
According to stipulation, payments due plaintiff under an application of AAE 40-B' amount to $8,486.10. With the addition of $11,190.68, which is owing to plaintiff on other shipments not disputed, the total amount plaintiff is entitled to recover is $19,676.78, and judgment will be entered in that amount.
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, a corporation of the State of Utah, is a common carrier by railroad over its own lines and in connection with other carriers.
2. After the petition was filed, a number of the plaintiff’s claims were disposed of by administrative settlement, withdrawal, and by stipulation of the parties. The only claims in controversy raise the issue as to the tariffs that are applicable to certain shipments of ammunition and explosives which were stopped in transit at the Eialto Ammunition Back-up Storage Point while enroute from inland points in the United States to the West Coast for export.
This dispute involves 30 bills of lading. As to the remaining claims in suit, the parties are agreed that plaintiff is entitled to be paid $11,190.68.
3. During the period from March 3,1944, to July 20,1944, plaintiff and connecting carriers performed transportation services for the defendant by transporting and delivering to defendant at the Los Angeles Port of Embarkation 30 shipments of ammunition and explosives, which were designated as explosive bombs, ammunition for cannon, projectiles for cannons, and explosive mines. Plaintiff was the final line-haul carrier. The shipping points shown on the Government bills of lading were Avondale, Colorado; Herlong, *343 California, and Clover, Utah, except for one shipment originating at Edgewood, Maryland. Each shipment was consigned to the Port Transportation Officer of the Los Angeles Port of Embarkation, and the destination in each case was Victory Pier, Long Beach, California. By order of the defendant, each of the shipments was stopped in transit at the Rialto Ammunition Back-up Storage Point near Rialto, California, and was thereafter transported on to Victory Pier for loading aboard ship to be exported overseas. Delivery of each shipment was made and accepted at Long Beach, California, where the Port Transportation Officer receipted for the shipments and accomplished the bills of lading.
4. With the exception of one shipment which originated at Edgewood, Maryland, after February 1,1944, all the shipments in suit moved from original points of origin in the United States prior to February 1,1944, and were thereafter stored in transit at either Avondale, Colorado; Herlong, California, or Clover, Utah. The stoppage in transit at these points, sometimes hereinafter referred to as the inland transit stations, was for the purpose of enabling the defendant to unload the explosives from the car, store them, and, where necessary, to repaint the projectiles, to box, re-box, crate, re-crate or mark the explosives, or to replace any defective assemblies on the bombs before reshipment to the port. After the storage in transit, the shipments moved to the port by way of the Rialto depot under new outbound bills of lading issued at Avondale, Herlong, or Clover, after February 1,1944.
5. The shipments of ammunition in issue were part of a large quantity of ammunition, explosives, and other war materiel transported from various points in the United States to the Los Angeles Port of Embarkation, which was operated by the War Department for the handling and loading of war materiel aboard ships for export overseas. Long Beach Harbor was part of the Los Angeles Port of Embarkation, and Victory Pier at Long Beach Harbor was constructed by the War Department and was set aside exclusively for the loading of ammunition and explosives aboard ship. Approximately 150 rail carloads of ammunition con *344 stituted a normal shipload, but the rail tracks at Victory Pier held only 24 cars. The port area was surrounded by heavily populated and developed areas. In view of the existing conditions, and in order to facilitate the movement, inspection, storage, assembling, stowage, and transshipment of the ammunition and explosives in such a manner as to create a minimum hazard to life and property, the War Department in 1942 acquired and established the Rialto Ammunition Back-up Storage Point near Rialto, California. It was located in the Mojave Desert, about 90 miles inland from Los Angeles. The facility, hereinafter referred to as the Rialto depot, was activated in 1943 and consisted of an area of approximately four square miles. For reasons of security and to provide maximum protection in the handling of explosives, the area was enclosed by a high wire fence with ingress and egress gates under the control of War Department personnel. Inside the enclosure were 118,071 lineal feet of Government-owned trackage, having a maximum storage capacity of 40Í railway cars. There were classification yards capable of handling 125 cars, and a storage spur on which 50 cars could be placed for outbound movements. Besides the administration buildings and housing, there were 20 igloos for storing explosives. Included in the Government trackage, there were 40 barricaded storage spurs having a capacity for storing 200 cars of explosives. The Government-owned spur track extended southward outside the enclosure and made connection with a track of the Atchison, Topeka, and Santa Fe Railway Company, hereinafter called the AT&SF, which track ran in a northerly direction from the AT&SF station at Rialto, California. The ammunition depot was about three miles from the AT&SF station at Rialto, which, in turn, was located four miles west of San Bernardino, California, where the AT&SF interchanged with plaintiff.
6. The Rialto depot was not a part of the commercial port of Los Angeles, but it was under the command and jurisdiction of the Port Transportation Officer. The depot was a facility established and operated to enable the Los Angeles Port of Embarkation to handle shipments of ammunition and explosives under the conditions and for the purposes *345 stated in finding 5. Instructions regarding tire operation of the Rialto depot were included in regulations issued by the War Department with respect to installations in Long Beach Harbor and other facilities under the jurisdiction of the commanding officer of the Los Angeles Port of Embarkation.
7. As previously stated, all of the shipments involved in this action were stopped in transit at the Rialto depot. In most instances, the Government bills of lading contained instructions and routing directions that the cars be stopped off in transit at the Rialto depot. In the few cases where the bills of lading did not so provide, the cars were stopped in transit at the depot in accordance with the following letter which the Port Transportation Office mailed to the AT&SF agent at San Bernardino, California, on March 18, 1944:
This will confirm our phone conversation of this date in regard to the set-out of high explosive carloads at our Rialto Ammunition Storage Point.
Our shipping points have all been instructed to route high explosive carloads for “stop-off in transit at Ri-alto”, however, in some cases they have failed to include this stop-off, and in some cases, we understand the carriers have failed to include this notation on their billing. Therefore, we request that all carloads of high explosives moving westbound for the Los An-geles Port of Embarkation be set out at Rialto. The only exception to these instructions would be an occasional car that would have to by-pass Rialto to meet a schedule. In these cases you will be notified in sufficient time to make the exception.
Your cooperation in this matter will be greatly appreciated.
When the railroad cars containing ammunition arrived at San Bernardino, the yard clerk of the AT&SF examined the waybills, and if they did not show that the shipment was to be stopped at the depot, the ammunition was sent there in accordance with the above-quoted letter.
8. When the shipments arrived in San Bernardino, California, they were moved by switching engines and crews of the AT&SF a distance of about seven miles to the Rialto depot. These movements were usually in groups of from 8 *346 to 15 cars, which were backed into the enclosed area of the depot, and at that point the carrier uncoupled its engine and left the cars in the custody and control of the defendant. Defendant maintained a switch engine within the area and moved the cars onto the depot’s classification tracks where the car seals and the exteriors of the cars were carefully inspected for evidence of sabotage. Then the cars were moved by defendant’s switch engine to the barricaded storage spurs where the cars could be stored safely as to quantity and distance requirements. Here the car seals were removed, the car doors opened, and an inspection of the lading, dun-nage, and interior of the car was made by Government inspectors who would repair and replace any damaged dunnage and would also repair any damage to the cargo. In most instances, no repairs to the dunnage were required, but there were occasions when some of the wooden supports used for keeping the ammunition in place were broken, and the supports had to be repaired or replaced. On at least one occasion during the time pertinent to this action, the coopering or banding on some of the ammunition containers was broken enroute so that the load of ammunition above the broken containers had shifted. It was therefore necessary to unload a portion of the ammunition, repair the damaged containers and then reload the ammunition in the car. After the cars had been inspected and any needed repairs had been made, new seals were placed on the cars and the explosives were stored in the same cars in the barricaded areas until reshipped to the port.
When the Rialto depot was first activated, the War Department had planned to unload the cars and store all the explosives in igloos in order that the railroad cars could be released for other purposes. However, it developed that the unloading and reloading of the ammunition were hazardous and required more personnel than was available at the depot. It was also found that the period of time during which the cars were held in the depot was so short that the unloading and reloading were not justified. Therefore, in most instances, the War Department adopted the practice of leaving the ammunition and explosives stored within the cars as originally loaded, and that practice was followed *347 on the shipments in suit. In some instances, ammunition for small arms was unloaded at the depot, stored in the igloos, and then sent on to the port area by truck. .
The time required by the Government inspectors for the external inspection of each car that arrived at the depot was about five minutes, and an additional ten minutes per car was generally needed for the internal inspection that occurred in the barricaded storage areas. No explosions occurred on any of the shipments which stopped at Eialto or between the depot and the port of embarkation.
9. The Port Transportation Officer of the Los Angeles Port of Embarkation was kept informed of the whereabouts of all shipments of ammunition that were consigned to the port. The Ordnance Office advised the Transportation Office of the date that a ship would be available for loading and stated the kind and amount of ammunition that would be needed. In view of the explosive nature of the cargo, a plan for storing the ammunition aboard ship was made, and the plan was cleared with the Ordnance Office and other interested Government officials. When the plan was approved, the Transportation Office ordered the Kialto depot to send forward ammunition of the kind and in the order required by the ship stowage plan. The cars containing the required explosives were then switched by the defendant from the barricaded storage areas and assembled in the order required by the ship stowage plan on the outbound storage spur. Then the AT&SF was instructed to move them from the enclosure and to backhaul the cars seven miles to San Bernardino where they were interchanged to plaintiff for delivery at the port over the Union Pacific Line from San Bernardino to the port. This routing was used on all the shipments in suit by order of the defendant. Each of the shipments moved on to the port in the same car in which it came into the depot, on the same waybill, and on the same bill of lading. The Port Transportation Officer had orders outstanding that the maximum number of ammunition cars in the Long Beach Harbor area or in the rail yards adjacent thereto should not exceed 50 cars at one time and, as already stated, the rail tracks at Victory Pier held only 24 cars. In view of these facts, the requirement for *348 expeditious movement oí the explosives from Rialto was urgent.
10. The shipments of ammunition were handled at the Rialto depot in conformity with the following instructions, which were promulgated on January 4, 1944, by the commanding officer of the Los Angeles Port of Embarkation:
1. All ammunition, explosives, chemical ammunition and toxic gases in bulk will be routed through the Rialto Ammunition Backup Storage Point.
RIALTO
2. Commanding Officer, Rialto, will have the following responsibility for cars while at that point:
a. Segregate to conform with quantity-distance, safety factor.
b. Security protection.
c. Open and inspect for security.
d. Close with numbered seals before leaving Rialto.
e. Notify Port Transportation Officer and Ordnance Supply Branch of departure and seal numbers. Chemical Supply Branch will also be notified when chemicals are involved.
*}» «fí »[»
11. Erom the time each of the cars in suit was released to the custody of defendant’s representatives on arrival of the cars at the Rialto depot until the AT&SF backhauled the cars to San Bernardino on the outbound movement to the port, the defendant was in sole possession of the cars and retained complete control over them. On the average, the defendant kept the cars in which the ammunition was stored in the depot for periods of from two to five days, although some cars were held there for as long as ten days. The Rialto depot was heavily guarded against fire and the possibility of sabotage. No representative of the rail carriers could enter the depot except by permission of the defendant’s representatives.
12. Aside from the Rialto depot, the defendant had no facility serving the Los Angeles Port of Embarkation where the cars could be stopped, where the explosives could be stored aboard the cars, and where the other purposes for which the depot was operated could be accomplished. It *349 would have been possible for the Government to hold the cars somewhere in the port area until ships were available for transshipment of the explosives. However, because of the large number of armed men that would have been required for guarding the cars against sabotage at the port, the congestion in the area, the dangerous nature of the cargo, the uncertainty of shipping schedules, and the necessity for stopping, inspecting, storing, and assembling the cars containing the explosives in accordance with defendant’s ship stowage plans, it would have been impracticable for the War Department to handle the large quantity of explosives that was exported at Victory Pier without the use of the Rialto depot.
13. Plaintiff contends that the transportation services on all of the shipments in suit were performed under and by the authority of AAR Section 22 Quotation 40-B at the request of the defendant and that the freight charges should be assessed in accordance with the provisions of that quotation.
On the one shipment which originated at Edgewood, Maryland, and on 13 shipments which originated at various eastern points and were stored in transit at Avondale, Colorado, before proceeding to the port via the Rialto depot, the defendant has computed the freight charges on the authority of AT&SF Circular No. 2140.
The remaining shipments originating at eastern points in the United States were stored in transit at either Avondale, Colorado, or Herlong, California, and were thereafter stopped in transit at the Rialto depot before movement to the port for export. As to these shipments, the defendant contends that the freight charges should be assessed pursuant to the provisions of AAR Section 22 Quotation 31-C and AT&SF Circular No. 2140.
14. By August of 1942 the War Department had acquired and developed a number of back-up storage facilities where ammunition and explosives could be stored and held away from the densely populated port areas and protected by Government armed guards from potential sabotage and from where these commodities could be forwarded as requested and required to the port for exportation to the armed forces overseas. In order to have the benefit of the through ex *350 port rate on rail shipments that were diverted to or stopped at such back-up depots and subsequently shipped to a port, the War Department requested the Association of American Railroads to promulgate a Section 22 quotation that would accomplish that result. After conferences between the War Department and the carriers, a draft of the quotation was prepared, accepted by the War Department, and issued on November 6, 1942, as AAR Section 22 Quotation 40-A.
By letter of March 12, 1943, the War Department wrote the Association of American Railroads that there were instances where shipments of ammunition arriving at the backup depots and actually or constructively placed for delivery there, were reforwarded to the ports in the original cars without being reloaded. Accordingly, the War Department requested that the quotation be amended to relieve the Government of the burden of surrendering the inbound bills of lading for the movement into the back-up depot and of preparing new outbound 'bills of lading for the movement to the port. The request was granted through the issuance on March 17, 1943, of Amendment No. 3 to Quotation No. 40-A.
The Rialto Ammunition Back-up Storage Point was not listed in Quotation 40-A as one of the depots to which the quotation applied until January 10, 1944. AAR Section 22 Quotation 40-A with amendments continued in effect until it was cancelled on February 3, 1944, by AAR Section 22 Quotation 40-B.
15. AAR Section 22 Quotation 40-B listed in Item 3 thereof the kinds of ammunition and explosives that are pertinent to this action and also named the Rialto Ammunition Back-up Storage Point as one of the depots to which the quotation applied. The quotation with the amendments that were applicable during the period pertinent to this action contained the following provisions:

Traffic Covered

Item No. 1.
The traffic covered by and subject to this Quotation, is the commodities listed in Item No. 3, when originating at points in continental United States, shipped by the War Department or Navy Department *351 hereinafter referred to as “the Government”, on Government bills of. lading, moving all-rail, in carloads, consigned to or intended for a port in continental United States for transshipment by vessel, which
*****
(b) before arrival at the port to which consigned is diverted to or stopped at a back-up depot listed in Item No. 4 for storage and subsequently reshipped to the port to which originally consigned and from there transshipped, * * *

Transit Privilege

Item No. 2.
(a) Subject to compliance with all the terms and conditions of this Quotation, each shipment of the kind referred to in Item No. 1 may be stopped in transit at one of the 'back-up depots listed in Item No. 4, for storage by and at the expense of the Government, and reshipped therefrom to the port or pier served by such back-up depot, at the through all-rail rate specified in Item No. 7. Such stopping is referred to in this Quotation as the “transit privilege”. Such transit privilege will be granted only by the inbound line-haul carrier serving the railroad station at which the back-up depot is located, and except as provided in (b) of this item, each such shipment shall be entitled to but one transit privilege. No such shipment as to which any of the applicable terms and provisions of this Quotation have not been complied with shall be entitled to the transit privilege.
(b) Notwithstanding the provisions of A. A. E. Section 22 Quotations Nos. 16-1) and 31-C, as amended or reissued, a shipment of the kind referred to in Item No. 1, which has been stopped in transit not more than once, under the provisions of either Quotation No. 16-D or 31-0 (but not both), may be accorded one further transit privilege under this Quotation.
* £ * * *

Land-Grant Deductions Not Applicable

Item No. 10
The rates provided under this Quotation are special rates not available to commercial shippers and are, therefore, not subject to any deduction on account of land grant, but nothing in this Quotation shall deprive the Government of the right to avail itself of any pub- *352 listed tariff rate to which it lawfully is entitled, less any lawfully applicable land-grant deduction.

Charges a/nd Alloioances

Item No. 11
In the absence of specific provisions to the contrary in this Quotation, shipments accorded the transit privilege under this Quotation are subject to all charges and all allowances for, or in respect of, diversion, recon-sigmnent, arbitraries, car rentals, car service, demur-rage, inspection, storage, switching and to all other privileges, charges and rules -which in any way increase or decrease the amount to be paid on any shipment or which increase or decrease the value of the service, as provided in applicable tariffs on file with the Interstate Commerce Commission, or by Section 22 Quotations, without, in any case, any land-grant deduction. ‡ ‡ $

Freight Reshipped From Bach-up Depot Without Being Unloaded

Item No. 19
Freight in a car which is consigned to a back-up depot and there actually or constructively placed for delivery, and subsequently reshipped therefrom as provided in Item No. 1 without being unloaded also is subject and entitled to the transit privilege. On such shipments, at the option of the Government, the provisions of Item No. 18 will not apply, and all charges accruing to, from and at the back-up depot under this Quotation may be allowed to follow the car for collection at port of transshipment.
Hi ❖ ❖ Hi *

Effective Date

Item No. 21
This quotation shall be in effect and applicable to all shipments moving hereunder from original point of origin on and after February 1, 1944, and Quotation No. 40-A, as amended, is cancelled effective February 1, 1944, except as to any accrued rights and liabilities of either party thereunder.
18. Item 9 of Quotation 40-B provides that the carrier shall be paid a charge of Sy2 cents per hundred pounds on the weight of the outbound shipments from the station where the back-up depot is located as compensation for the transit *353 privilege granted by tbe quotation, and Item 8 of the quotation authorizes the carrier to collect a backhaul charge where a backhaul or out-of-line is required in connection with the railroad that participates in the line-haul movement. For the mileage involved here, the quotation fixes a backhaul charge of 5y2 cents per hundred pounds.
On most of the shipments in issue plaintiff contends that it is entitled to be compensated for the transportation services performed on the basis of the through export rates from Edgewood, Maryland; Avondale, Colorado; Herlong, California, and Clover, Utah, to Long Beach, California, plus a charge of 9 cents per hundredweight on the freight for the services performed at the Rialto depot. The stations named are the shipping points shown on the bills of lading on which plaintiff’s suit is brought, and plaintiff’s charges are computed in accordance with the terms of Quotation 40-B. On a number of the shipments, however, the use of a combination of local rates with land-grant deductions from the same points of origin to Rialto and from Rialto to the port produces lower charges than those provided by AAR Section 22 Quotation 40-B. As to such shipments, plaintiff agrees that the provisions of Item 10 of Quotation 40-B apply and that the combination of local rates with land-grant deductions and with no charge for the services performed at the Rialto depot are applicable.
17. If it is held that freight charges should be computed on the basis urged by plaintiff, the parties have agreed that the net amount that would be due plaintiff on the disputed shipments is the sum of $8,486.10 and that with the addition of the sum of $11,190.68, which is due plaintiff on other shipments not in dispute, the total amount that plaintiff would be entitled to recover is $19,676.78.
18. At the request of the War and Navy Departments, AAR Section 22 Quotation No. 31 entitled “Transit Arrangements on Ordnance” was issued on August 29, 1942. The purpose of this quotation was to enable the Government to ship carloads of ammunition and explosives on Government bills of lading, to stop the shipments in transit for storage at designated ammunition depots and arsenals in the United States for as long as 24 months, and to subsequently *354 reship the ammunition and explosives to a port for export at the through export rate from the original point of origin to the port without land-grant deductions and plus the payment of a transit charge. The ordnance depots located at Avondale, Herlong, and Clover were listed as transit points to which Section 22 Quotation No. 31 was applicable. All of the shipments in issue which were stored at either Avon-dale, Herlong, or Clover, moved from original points of origin before February 1, 1944.
At the time such shipments moved from the original points of origin, Section 22 Quotation 31-C, a revision of Quotation 31, was in effect. It contained the following pertinent provisions:
Item No. 2, Transit Privilege, is amended to read as follows:
Subject to compliance with all the terms and conditions of the Quotation, each shipment of the kind referred to in Item No. 1 may be stopped in transit at not more than two storage depots designated in Item No. 4 for storage by and at the expense of the Government and reshipped therefrom to any port or rail head referred to in Item No. 1 at the through all-rail rate specified in Item No. 7. Such stopping is referred to in this Quotation as the “transit privilege”. Such transit privilege will be granted only by the inbound line-haul carrier serving the railroad station at which the storage depot is located, and each shipment shall be entitled to not more than two transit privileges. No such shipment as to which any of the applicable terms and provisions of this Quotation have not been complied with shall be entitled to the transit privileges.
% # Hi * #
Item No. 7

Bates To Be Applied

$ $ $ * $
(b) Through rate, subject to the provisions of Item No. 21:
Except as otherwise provided in this item, each shipment made from its original point of origin under the terms of this Quotation prior to May 15, 1943, will be subject and entitled to the lowest through all-rail carload rate (joint or combination) thereon, from such point of origin to its port of transhipment or rail head in effect on the date of such shipment: and each ship *355 ment made from its original point of origin under the terms of this Quotation on and after May 15, 1943, will be subject and entitled to the lowest through all-rail carload rate (joint or combination) thereon, from such point of origin to its port of transhipment or rail head in effect on May 14, 1943 as shown in tariffs then on ifie with the Interstate Commerce Commission or any State regulatory authority,
`ti) ap~1icab1e o~r the route of movement via the storage depot, or
(ii) where a back-haul or out-of-line haul is involved, applicable via the point or points from and to which the out-of-line or back-haul charge under Item No. 8 is determined,
made 65 per cent of the first-class rate in effect on May 14, 1943 as shown in tariffs then on file with the Interstate Commerce Commission or any State regulatory authority, (except that on traffic originating and terminating in Mountain Pacific and Pacific Coast Territories the privileges of this Quotation will be applicable only in connection with rates in effect on May 14, 1943, quoted by Chairman J. G. Stubbs in T. C. F. B. Section 22 Quotation No. 13, as amended), subject to minimum weight of 50000 pounds per car,
plus, in either case, the back-haul or out-of-line-haul charge named in Item No. 8, the transit charge named in Item No. 9 and all other charges including, without limitation, diversion, reconsignment and/or switching charges, if any, as provided in this or other applicable Quotations, or in tariffs on file with the Interstate Commerce Commission or any State regulatory authority. In no case shall the through rate applied be less than the all-rail carload rate from the railroad station at which the storage depot is located, or in the case of a shipment accorded two transit privileges, from the railroad station at which the first storage depot is located, to the port of transshipment or rail head, plus the transit charge named in Item No. 9.
Ia~ No. 10
La'md-Grai~t Deductions Not AppZicabZe
Except as provided in Item No. 2~[[Y;725;32;732;48], no rate or charge applicable to any shipment moving under this Quotation shall be subject to or reduced by any land-grant deduction.
*356 Item: No. 12

Charges and Allowances

In tbe absence of specific provisions to the contrary in this Quotation, shipments accorded the transit privilege under this Quotation are subject to all charges and all allowances for or in respect of diversion, reconsignment, arbitraries, car rentals, car service, demurrage, inspection, storage, switching and to all other privileges,charges and rules which in any way increase or decrease the amount to be paid on any shipment or which increase the value of the service as provided in applicable tariffs on file with the Interstate Commerce Commission or any State regulatory authority, without, in any case, any land-grant deduction.
$ $ $ ‡ $
Item: No. 21

Alternate Afflication of Commercial Tariffs

(a) Where the storage-in-transit privilege defined in Item No. 2 is published in a tariff on file with the Interstate Commerce Commission or any State regulatory authority, the rules and charges applicable to such tariff transit privilege may be applied in preference to the provisions of this Quotation at the option of the Government.
(b) Where the combination of published tariff rates to and from the railroad station at which the storage depot is located, less any land-grant deduction lawfully applicable, produces on any shipment a rate lower than the through rate provided for in Item No. 6, such lower rate shall be the rate applicable on such shipments. In any such case, the transit charge provided in Item No. 9 will not be charged.
❖ ❖ ❖ ❖ *
19. The Eialto depot was not listed as one of the transit stations to which Section 22 Quotation 31-C applied. Until February 3, 1944, Quotation 31-C contained no provision which gave the Government the benefit of the through export rate from the original points of origin to the port in instances where the ammunition was stored in transit at interior points such as Avondale, Herlong, or Clover and was later stopped or stored in transit at a back-up storage depot such as the Eialto depot before moving to the port. *357 Amendment No. 6 to Quotation 31-C, which was issued February 3, 1944, provided:
(f) Effective as to shipments from original point of origin on and after February 1, 1944, on shipments accorded one transit privilege under this Quotation to a back-up depot specified in A. A. R. Section 22 Quotation No. 40-B, amendments thereto or reissues thereof, for a further transit privilege under the terms of that Quotation.
The above-quoted amendment had no application to the shipments in suit that were stored at the inland transit stations before moving to the Rialto depot, because all of such shipments left the original points of origin prior to February 1,1944.
Under AAR Section 22 Quotation 40-B, the Government was not entitled to the benefit of the through export rate from the original points of origin to the port on the shipments stored in transit at Avondale, Herlong, or Clover, and again stopped in transit at the Rialto depot, because the shipments moved from eastern points of origin to Avondale, Herlong, or Clover prior to February 1, 1944.
20. For many years prior to the shipments in issue, the AT&SF had published and filed a tariff designated as Circular 2140-A-5, which was effective from February 6, 1939, until superseded by Circular No. 2140 on April 5, 1944. Both circulars contained identical pertinent provisions in effect throughout the period involved here and will be collectively referred to as Circular 2140. On its title page, Circular 2140 stated that it named “Rules and Charges Governing Diversion of or Reconsignment of Freight and Holding of Shipments for Surrender of Bills-of-Lading or Written Orders * * * At Stations on the A. T. & S. F. Ry., G. C. & S. F. Ry., P. & S. F. Ry. or M. & E. T. Co.”. The pertinent provisions of the circular are as follows:

Item Subject Rules

7 Rule Applicable (B) These rules apply to a car which is in While Freight is the possession of this line as a road-haul in Possession op carrier, or while on its public delivery or These Companies other tracks, or while the car is on private or assigned sidings connected with this line; also when such car has reached billed destination on this line and has been delivered to a switching road for placement.

*358
Item Subject Rules

10 Definition of Terms: The term “Diversion” or “Reconsignment” means:
(a) A change in the name of the consignee; (b) A change in the name of the consignor; (c) A change in the destination; (d) A change in route at the request of consignor, consignee or owner;
Diversion or Reconsignment (e) Any other instructions given by consignor, consignee or owner necessary to effect delivery and requiring an addition to or a change in billing or an additional movement of the car, or both.
Destination Except as otherwise provided' herein, the term “Destination” as used in these rules means the billed destination, or if such destination is served by a terminal yard, then such terminal yard will be considered as the destination.
(a) The services herein authorized are subject to the condition that shipment has not broken bulk (see Note).
15 Conditions: Breaking Bulk Note: The term “broken bulk” as used herein is not to be construed as applying to the removal of samples of the lading of the cars for such purposes as inspection, grading or testing (provided only such samples are removed from the premises or property of this railroad as are necessary to determine the grade of the commodity), nor to carload shipments which, under the provisions of applicable tariffs, have been stopped in transit for partial unloading or completion of load.
20 Exceptions: 1. Rules 1 to 17, both inclusive and including the items under captions “Application” (Item 7), “Definitions” (Item 10), and “Conditions” (Item 15) will Not apply to:
Shipments Within Switching Limits (e) Traffic moved entirely within switching limits on which no road haul service is involved.
35 Freight Rates Rules and charges Application of Rule 2
Where the through rate is authorized under these rules it is the applicable rate (local rate, joint rate, or combination of intermediate rates) in effect on date of shipment from point of origin over the route of movement via the diversion or reconsignment point to final destination. (See Rule 5, Item 50.)

*359
Item Subject Buies

40 Demurrage and TRACK Storage Rules Rule 3 Cars stopped, diverted or reconsigned under these rules also will be subject to demur-rage and track storage charges lawfully in effect at the point where stopping, diversion, or reconsignment is accomplished.
50 Change in Rule 5 Destination (a) Only one change in destination at the applicable rate (see Rule 2, Item 35) from point of origin to final destination will be permitted by this line under these rules, and then only provided the ear has not had a previous change in destination while on the lines of other carriers after leaving the initial billing point. (See Rule 8-a, Item 65.)
65 Stopping-in-Transit Notifying Consignee of Cars Held at Holding Point Rule 8 (a) Except as otherwise provided in Rule 5, Item 50, if'on request of consignor, consignee or owner a car is stopped for orders for-the purpose of delivery or diversion or reconsignment or reforwarding prior to the arrival at original billed destination, a charge as shown in Groups A and B below, will be made for such service and the point where the car is stopped will be considered the original destination of the freight, and notice will be sent or given to the party (at the post office address designated by him) on whose order car is held. If the car is subsequently forwarded from point at which held, the provisions of Rules 10,11 and/or 14, Items 75, 80 and 95, as the case may be will also be applied. The service of stopping as provided in this rule will not prevent one change of destination under the provisions of Rule 5, Item 50.
75 Diversion or Reconsignment to Points Outside Switching Limits Before Placement Rule 10 If a car is diverted or reconsigned on orders placed with local freight agent, or other designated officer, after arrival of ear at billed destination, but before placement for unloading, the through rate (Rule 2, Item 35) will be applied and a charge as shown in Groups C and D belów will be made for such service, except as provided in Note 1.
Exception 1. — No diversion or reconsignment charge will be assessed when the combination of tariff rates applicable on a shipment terminating at and on a shipment originating at the point of diversion or recon-signment is applicable to the shipment.

*360
Item Subject Rules

85 Diversion or Reconsignment to Points Outside Switching Limits After Placement Rule 12 If a car has been placed for unloading at original billed destination and is forwarded therefrom, without being unloaded, to a point outside of the switching limits, it will be subject to the published tariff rates applicable on a shipment terminating at and on a shipment originating at the point of diversion or reconsignment. (See Exceptions 1, 2, 3 and 4.)
95 After Placement Rule 14 (b) After Placement: If a car has been placed for unloading at original billed destination and is forwarded therefrom without being unloaded, it will be subject to the tariff rates applicable on a shipment terminating at and on a shipment originating at the point of diversion or reconsignment. (See Exceptions 1, 2 and 3.)
115 Intermediate Point Rule 20 The reeonsigning point will be considered as intermediate between the point of origin and final destination providing it is intermediate via any authorized route, and this line must be party to the through rate applied. (See Rule 21, Item 120.)
120 Change in Rule 21 Destination Except as provided in Rule 20, Item 115 Involving Back when change in destination involves a back or Out-of-Line or out-of-line haul from point of origin Haul through point of diversion to point of final destination, an additional charge will be made as shown below, and will cover all additional back or out-of-line services performed.
Circular 2140 provided for tbe payment of a charge of $6.44 per car for a diversion or reconsignment made under Item 75, Rule 10, plus a charge of $2.48 per car for the privilege of stopping the car. For the mileage applicable in this action, the circular also provided for a charge of 214 cents per hundred pounds of freight for a backhaul or out-of-line haul made pursuant to Item 120, Rule 21.
21. For the purpose of computing the freight charges which it asserts are due on the shipments in dispute, the defendant has divided the shipments into four groups.
Group I consists of a single shipment which originated at Edgewood, Maryland, on June 27, 1944, was stopped in transit at the Rialto depot and was thereafter delivered to *361 the port. On this shipment the Government contends that Circular 2140 applies to the stop in transit at Rialto depot and has computed its charges on the basis of a single-factor joint through rate less land-grant deduction, plus the sum of $8.92 per car. The $8.92 consists of the reconsignment charge of $6.44 per car and a charge of $2.48 for stopping the car as provided in Circular 2140. This computation does not include any allowance for the backhaul of seven miles from Rialto to San Bernardino. Defendant claims that under the provisions of Item 115, Rule 20 of Circular 2140, no backhaul charge is due.
Group II consists of eleven shipments which moved from eastern points of origin prior to February 1,1944, and were thereafter stored in transit at Avondale, Colorado. After the storage in transit, the shipments were again stopped in transit at the Rialto depot before being moved to the port. Since the combination of local rates to and beyond Avondale produces lower charges than were otherwise available, the defendant has computed the freight charges on these shipments as if they had originated at Avondale. In all other respects, the freight charges have been calculated in the same way as the Group I shipment and in reliance upon the provisions of Circular 2140.
Group III consists of five shipments which originated at points in the eastern part of the United States prior to February 1, 1944, and were thereafter stored in transit at Avondale, Colorado. After the storage in transit, the shipments were again stopped in transit at the Rialto depot and were then moved to the port over the route herein described. As to such shipments, the Government claims that the provisions of both AAR Section 22 Quotation 31-C and Circular 2140 are applicable and asserts that the charges should be assessed on the basis of the through rate provided for in Item 7 (b) of Quotation 31-C from the eastern points of origin to Long Beach Harbor, plus the transit charge provided for in Quotation 31-C and also plus the charge of $8.92 per car for the stop and reconsignment at Rialto pursuant to the provisions of Circular 2140. For the reasons hereinafter stated and in ¡view of the provisions in Item 115, Rule 20 of Circular 2140, the defendant’s computation *362 does not include any payment for the backhaul charge specified in Item 120, Rule 21 of Circular 2140. On the shipments in this group, the defendant has offset the amount of freight charges which it paid to other carriers on the shipments which moved from the eastern points of origin to Avondale against the amount which defendant contends is due plaintiff on these shipments under defendant’s computation made pursuant to the provisions of Quotation 31-C and Circular 2140.
Group IY consists of eleven shipments which originated at eastern points prior to February 1,1944, and were thereafter stored in transit at Herlong, California. After the storage in transit at Herlong, the shipments were again stopped in transit at the Rialto depot before being transported to the port as herein described. Since there were no tariffs in effect which provided for a through rate from the eastern points of origin to the port over the route on which these shipments moved, the Government has based its charges on the provisions of AAR Section 22, Quotation 31-C and Circular 2140. In so doing, it has applied a combination of rates from the eastern points of origin to Rialto, California, and from Rialto to the port. This rate used is based principally on the language contained in Item 7 (b) of Quotation 31-C and is equivalent to the rate defendant used for the Group III shipments. As to this group, defendant asserts that the reconsignment charge of $6.44 per car for the reconsignment at Rialto is not due because of the provisions of Exception 1 of Item 75, Rule 10 of Circular 2140. The freight charges paid to other carriers on the movements from points of origin to Avondale have also been offset against the amount defendant has arrived at for the shipments in this group.
If the freight charges should be computed as contended for by defendant with respect to the four groups described above, plaintiff has been overpaid the sum of $3,293.55 on the shipments in controversy. A deduction of this sum from the $11,190.68 due plaintiff on other claims not in dispute would result in a judgment for plaintiff in the amount of $7,897.13.
*363 22. As an alternative contention, the defendant takes the position that if it is held that the provisions of AAE Section 22 Quotation 31-C do not apply to the shipments described in Groups III and IV of the preceding finding, the provisions of Circular 2140 are applicable to all of the shipments. If the freight charges should be computed in accordance with this contention, the net amount that would be due plaintiff on the disputed shipments is the - sum of $5,634.66, which when added to the $11,190.68 due plaintiff on claims that are not now disputed, would result in a judgment for plaintiff in the sum of $16,825.34.
23. As stated in the two preceding findings, defendant contends that Circular 2140 is applicable to the shipments in suit, but asserts that the back-up charge of 2% cents per hundred pounds of freight provided for in Item 120, Eule 21 of the circular, is not applicable to the backhaul performed on the shipments involved here because of the provisions of Item 115, Eule 20 of Circular 2140. At the time of all of the shipments in suit, the town of Eialto, California, where the. AT&SF maintained a railway station, was intermediate between the points of origin of the shipments and the port. Thus, the shipments could have been moved on routes provided for in tariffs to which the AT&SF was a party. The routes designated in such tariffs extended from points east of the AT&SF station at Eialto and from that station over the AT&SF line to the port. In 1943, after the Eialto depot was activated, the shipments of ammunition and explosives moved for a period of time from the Eialto depot to the Eialto station of the AT&SF and thence over its line to the port. However, the AT&SF route from the town of Eialto to the port moved through the center of the City of Pasadena, and the Security Division of the Army became greatly concerned over the shipment of such dangerous cargo through a heavily populated section of California. As a result, the defendant, acting through the Port Transportation Office, decided that all shipments of ammunition and explosives which left- the Eialto depot after the early part of 1944 should be routed by way of San Bernardino and delivered to the port on the line of the Union Pacific Eailroad Company, which received the cars *364 from the AT&SF at the interchange near San Bernardino. The route of the Union Pacific Railroad was through a less populous area. Both the AT&SF and the plaintiff cooperated with the Government in the routing and the handling of the explosives, and neither carrier made any objection to the new routing that had been ordered by the defendant. Thus, at the time the shipments in suit moved, the only route which the defendant wotdd permit the carriers to use in transporting the ammunition from the Rialto depot to the port was by way of San Bernardino over the line of the Union Pacific Railroad Company. As a result of the orders issued by the War Department, it was therefore necessary for the AT&SF to backhaul the shipments involved here to San Bernardino where they were delivered to plaintiff at the interchange there for movement on to the port.
24. On two shipments which were stored in transit at Clover, Utah, after leaving the original shipping point, the Union Pacific was the road-haul carrier from Clover to San Bernardino from which point the AT&SF moved the cars to the Rialto depot for the stop in transit there. The Union Pacific also performed the road-haul transportation from San Bernardino to the port. In view of the provision of Item 7 (B) of Circular 2140, the defendant admits that the circular has no application to the two shipments from Clover.
25. On a number of the shipments in issue, the AT&SF was the road-haul carrier from the inland transit stations to the Rialto depot. After the dispute involved here arose, the auditor of freight accounts and the head clerk of the Government’s account division in the auditor’s office of the AT&SF met with representatives of the General Accounting Office in Washington, D. C., for the purpose of attempting to settle administratively a suit that had been brought by the AT&SF. The representatives of the GAO described some of the details of the shipments in suit and requested the AT&SF representatives to express their opinion regarding the applicability of Circular No. 2140 to such shipments. The AT&SF representatives stated that in order to settle the claims in which that railroad was interested, its traffic department had decided to accede to the Govern *365 ment’s position that 2140 was applicable to the shipments. Both representatives of the AT&SF agreed that the circular applied. They pointed out, however, that the suit had been filed by the Union Pacific Bailroad Company, which was the final line-haul carrier, and suggested that the conference be held with that carrier’s attorney.
During the trial of this case, the AT&SF representatives testified that at the time they expressed the opinion mentioned above, they were unaware of the fact that when the shipments in issue were stopped in transit at the Rialto depot, the seals of the cars were broken and the contents of the cars inspected. They also testified that in view of these facts, they were of the opinion that AAR Section 22 Quotation 40-B rather than Circular No. 2140 was applicable to such shipments.
26. The Pacific Car Demurrage Bureau of Los Angeles, California, is an organization which represents the railroads in the Western States for the purpose of determining the application of demurrage rules and charges for the railroads operating within those States. During the early period after the activation of the Rialto depot and on those shipments where the bills of lading did not show that the cars had been stopped in transit at the depot, the demurrage was assessed on the basis of the export demurrage rates. Later, and beginning about the month of June 1944, when it was ascertained that the Government has instructed that the cars be stopped in transit at Rialto, the Pacific Car Demurrage Bureau began the assessment of demurrage charges on the basis of the domestic demurrage tariffs.
By letter of August 28, 1944, the War Department requested plaintiff and the AT&SF to grant the Government-export free time of seven days for the shipments stopped in transit at Rialto, stating that such a proposal would render the transit arrangements authorized by Quotation 40-B fully usable and remunerative for the services rendered by the carriers. On October 16, 1944, the carriers replied by letter, reading in pertinent part as follows:
This matter has been given careful consideration, and wish to advise as follows:
a. We are agreeable to handling westbound shipments moving via the UP through San Bernardino to *366 Los Angeles Harbor or Long Beach, for transshipment by water; over the rails of the Santa Fe from San Ber-nardino to Eialto Back-up Storage Point and return to San Bernardino thence via UP to the Port, subject to the transit charge and other terms and conditions set out in AAR Section 22 Quotation No. 40-B, as amended, and also subject to an additional out-of-line charge of 5%^ per 100 lbs., for the movement San Bernardino to Rialto and return; the arrangement set out in this paragraph to apply only on shipments originating in Nevada, Utah, Colorado or Wyoming west of Transcontinental origins stored in transit at points in Nevada, Utah, Colorado or Wyoming west of Group J.
b. We cannot see our way clear to authorize the application of export free time for detention of cars at Rialto. It is true that in a few instances carriers have permitted the application of export free time and de-murrage for aggregate detention at two ports, but this applies only in connection with two locations within the port area and switching districts of San Francisco on Los Angeles Harbor; and is not applicable at interior points such as Rialto which is a distance of some 90 miles from the port. We feel that to extend the application of the export free time at Rialto would set a precedent which would have a far-reaching effect in connection with other interior points at which export traffic held. We therefore are not prepared to make any departures from the application of the domestic basis for the detention of cars at Rialto.
If the above is acceptable and you will so advise us we will take necessary steps to handle the matter to a conclusion.
As a result of this correspondence, Amendment 8 to AAR Section 22 Quotation 40-B was issued July 2, 1945, and provided in pertinent part as follows:
EXCEPTIONS
(1) Shipments for the War Department may be held at Rialto Ammunition Back-up Storage Point, Rialto, Calif., for not exceeding two (2) days, date of arrival not included, free of charge. After the expiration of this free time, demurrage charges will be $2.20 per car per day for the first seven (7) days and thereafter $5.50 per car per day until car is released.
(2) Shipments for the War Department may be held at the Port of Long Beach, Calif., for not exceeding *367 two (2) days, data of arrival not included, free of charge. After the expiration of this free time, demur-rage charges will be $2.20 per car per day for the first seven (7) days and thereafter $5.50 per car per day until car is released.
On September 27, 1945, the War Department wrote the Association of American Eailroads regarding demurrage charges at Eialto, California, which had accrued since November 19,1943, in the amount of $39,578 to the AT&SF. The letter stated that these bills would be placed in line for settlement in accordance with provisions of Amendment 8 to AAE Section 22 Quotation No. 40-B.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States nineteen thousand six hundred seventy-six dollars and seventy-eight cents ($19,676.78).